May it please the court, I'm in counsel. I'm Kenneth Traiano. I represent Mr. Huizar-Velazquez, the appellant. I would like to reserve two or three minutes, three minutes for rebuttal. Counsel, as I recall, there's a guideline that says to pick where there's a general and a specific, pick the more specific. Do you happen to remember which one that is? Well, that seems to be a theme that runs through the cases. And it runs through them because it's a guideline that says so. I was looking this morning because I remembered it, and I was just hoping for your help. I think that might be maybe in the Chapter 1 introductory. Yeah, I'm sure it is. I'm familiar with the language, and I'll go into that area since you asked. Then there's another one that says conspiracy. You pick the substantive crime that it was a conspiracy to commit. But what I was looking for was the language in Chapter 1 about picking the more specific, and I couldn't find it this morning. Well, I think in this case, Your Honor, it all leads to the tax table in Section 2T4.1. I don't believe the provision that we've begun discussing this morning comes into play here because I think the myth of the Klein conspiracy that the government cites numerously through their briefs and in the district court needs to be dispelled somewhat. In this case, the focus was on determining the loss due to the defendants evading the anti-dumping duties that the Department of Commerce said. Help me on something else relating to that. The judge ordered a forfeiture, and I had always seen forfeitures where the government held a race, and the issue was whether to forfeit the race, the R.E.S. race, to the government. Did the government hold some race here of the amount of the forfeiture? I don't believe there was. I'm not sure. The number was submitted by the government and adopted by the court, but I would note that in the plea agreement, excuse me, there was no plea agreement. The district court refers to the amount set forth in the plea agreement in the forfeiture order. I didn't state this in my brief, but there was no plea agreement. So that to me is a plain error there, that particular conclusion by the district court. How would it be a plain error if it didn't affect things? Maybe we want to first finish up with which guideline, whether we should be under the duty import guideline, and then jump to the questions about forfeiture and some of the evidence submitted. So your position basically is we ought not be in the broad guidelines when we actually have a specific guideline that deals with basically evading import duties. Yes. 2C1.1, there is actually language in there that talks to Section 1343, which was one that the district court cited, but that commentary in 2C1.1 specifically states that you use this guideline when you're dealing with a public corruption type situation. When not, it refers to the appendix. And then if you look through the guidelines, 2T1.9 actually cites Klein and then refers you to 2T1.4 and 2T1.1, both of which ultimately direct you to 2T4.1, the tax table. Our position was that ultimately the tax table did apply, but I thought that it was kind of clear by how the 2T3.1 is worded and all the language in the commentary in the guidelines that that should be the place where you start when the gravamen of the offense is determining a lost customs tax. So would you speak to the loss issue, which basically my question there was your comment on whether there really was an independent finding by the judge or whether adopting, I guess it's the declarations from customs and others was sufficient. And I think your client actually had some claim that some of these hangers came under different categories than other hangers. Is that right? Yes, and he set forth a very detailed Exhibit 14, which is in our excerpts of record, sets forth all of the companies, the dates of the shipments and the amounts and the values that he claimed. And most of that came from discovery that was provided by the government. Defense counsel below also went one step further and looked at the wire transfers that the government alleged in the indictment and linked those to the names of the companies and the dates and the amounts that he had in Exhibit 14. The district court disregarded that, and I think that they were misled into the role of the declarant, Ms. Vance. Things moved kind of quick in this case. The defendant pled without a plea agreement. He pled after the co-defendant pled. They used 2T4.1 for the co-defendant. The co-defendant had a loss attributed to him of about $1.3 million. So that's what the defense was expecting, but the defense responded to the Vance declaration. Unfortunately, both sides missed the ball, I believe, as far as the specific rates that were in play. I think it dropped from 171 percent to 1.7 percent or something like that for several of the Chinese companies. Well, three of the companies, it dropped from 187.25 percent to 1.71 percent, and that's the table we put in our brief. Was the date. I saw the customs regulation. At first there was an order, and it had the higher amount, and then there was something in the Federal Register adopting the lower amount. Did the lower amount apply as of the date of the crime? It is made retroactive. In fact, the review process, which led to the one point. It's issued after the date, but it's expressly made retroactive to the date of the crime. Right. Well, it's made retroactive to the shipments. Did the customs agent use that calculation? My recollection is she refused to use it because she said, I don't know what companies she got the hangers from. That's the position she took, but I think the district court was misled to believe it was a black or white type of situation. He had to pick a side when, in reality, I think if Judge Houston knew what these were. The invoices that you had, did you submit them into evidence? Well, I was not the trial attorney. I don't care. When I say you, I mean the defense. I don't care who was the trial attorney. Were they submitted into evidence? They were submitted. There was a great deal of stuff submitted that's not in the excerpts of record. I submitted the exhibit that summarizes them, and the wire transfer that I discussed earlier is. . . I saw that, and I wanted to look at the invoices to see whether there was any justification for disregarding them. I mean, I went to the district court record and got all that, but how was the district court to figure out these different categories? Well, the district court should have had a hearing, I think, given the fact that the two parties were taking starkly different sides, but I think it was incumbent on the government to bring this to light. In my brief, when I cite the fact that the declarant, the expert, didn't mention this to the court and said that either she was withholding this information about the rate change or she was really incompetent on some level. . . She called it a slight rate change. Right. What was it, a 98%, 99% rate change, and she called it slight? It was, yes, at least that much, and the government in their papers said that. . . Did it affect a lot of the hangers or just an insignificant percentage of the hangers? Well, that's our table one, and we think it affected a lot. We went through, and an expert helped me, but really it's just a matter of a spreadsheet adding up the numbers and taking the shipments during the period of review where the rate was lower. Why don't we hear from the government, and you can reserve your remaining minute. Thanks. Good morning. Tim Perry for the United States. I want to start by articulating our position, which is that there should be a remand in this case. However, the scope of that remand should be limited to the orders of forfeiture and restitution. I have a couple of questions about that. Usually when we vacate a sentence, we vacate it and the district court gets a do-over, and it's wide open. It's very rare that we say, well, you keep the good parts, but you lose the bad parts, and I'm wondering why we should do that. There's a principal distinction here to be made. The forfeiture and restitution amounts are amounts that need to be made precisely because the defendant is charged with paying those precise amounts to the court and to the victims. By contrast, when it comes to the amount of loss calculations, this court has said, and the guidelines are very clear, that a district court need only make an approximate calculation. Okay. So you're saying keep that because it's good enough because it only has to be approximate. Yes. Okay. Let me ask you a couple of questions about these things. First of all, the forfeiture, I was nonplussed by that. Every time I've ever seen a forfeiture, when I was a district judge and on this court, there's always been a race. The government possesses something. It might be contraband like drugs, and then they don't need a forfeiture, or it might be noncontraband like money. They went to the drug dealer's house and they got a whole bunch of money, and they sued the money. The money is the race, and they get a forfeiture. Or if it's a criminal case and they already have the money, they just get a forfeiture order. I don't understand how there can be a forfeiture of something the government doesn't have. It looks like it's a fine. If anything, what it would be is that there's a credit that the Customs and Border Protection, the collection agency, is owed this amount of money, so they have a right to be paid. But the forfeiture statutes allow the United States to move for forfeiture of gross proceeds, and this was the theory here. If they have the proceeds. Do you understand what a race is? Yes, I do, Your Honor. In cases where you don't have actually the recovery of the item, there's a statute or it's in the guidelines that permit you to go to alternate to look at proceeds. Yes. We get to ask for gross proceeds for substitute assets. There are a variety of other. Do you have some proceeds? We do not have proceeds, no. We have not been able to recover those. Okay, now let me ask you a couple other questions that were on my mind. As I remember, and I couldn't find it this morning, maybe I'm wrong and you'll educate me. But as I remember, part of the instruction in Chapter, I think it's Chapter 1, as your opposing counsel said, is when there's a general guideline and a specific one, you look at the specific one. And another provision of the guidelines is when it's a conspiracy, you look at the crime that the conspiracy, that was the object of the conspiracy. Oh, you found it. Thanks. 1B1.2, Application Notebook. Yes, that's the one that gives you that. And there's a specific crime here for smuggling to evade tariffs. And there's a general crime of bribery, extortion, and conspiracy to deprive the government of honest services. Now, we all know what honest services fraud is, skill in case, that sort of thing. And this is a smuggling to avoid tariffs. It looks like you had the wrong guideline. I disagree, Your Honor. Explain. I believe, first I would point out that in the application notes, there is a provision that I believe has been handed to Your Honor that says that one should apply the specific guideline range that applies. And that makes sense. There's also an application note that commands the court to opt for the higher guideline range. More equally applicable. Right. Yes, Your Honor. And there is a specific guideline for client conspiracies or conspiracy to defraud the United States. If one goes to the appendix of the guidelines and looks for the first charge of conviction, count one here, section 371, it directs a sentencing court to go to 2C1.1, where there is a conviction for interference with governmental functions. And so the district court in this case did this. When one goes to 2C1.1, you will see this crime referenced in the title to that section. Okay. I understand the argument. All right. But also the background in 2C1.1 says, this section applies to a person who offers or gives a bribe for a corrupt purpose or to a public official who solicits or accepts such a bribe. I mean, we've really traditionally understood this to cover a certain kind of situation. And if you take the bribery offenses, if you imagine a Venn diagram of the bribery offenses and the conspiracy and where there's an overlap, then you might apply that. But it just seems here that where you've got the very specific statute having to do with imports, I guess I'm really at a loss to figure out why you wouldn't apply that. I have a two-step response to that. One is that's an incomplete reading of 2C1.1. There are many guideline provisions that apply to different crimes, and 2C1.1 is one of those. In fact, the background, which Your Honor just cited, says Section 2C1.1 also applies to conspiracy to defraud by interference with governmental functions. That's the second-to-last paragraph. It does go on to say that typically this involves bribery. But by saying typically, it implies that not always. And it makes sense to apply a higher guideline. Why does it make sense to? Bribery is a worse crime, as the guidelines numbers show. The commissioners think bribery is a much worse crime than evading tariffs. So why would they intend to use the bribery guideline for smuggling in coat hangers? I would call it the bribery and client conspiracy guideline. The reason that the higher guideline would apply to a case like this is because this case is not merely tariff evasion. As Judge Huston pointed out during the sentencing, the gravamen here is not just the evasion of duties. It is also the interference with legitimate governmental function. Here what the Department of Commerce and CBP are doing. But what's the difference? That's the broader class in which this narrower class exists. What this crime is, the most aggravated aspect of this crime, is that it interfered with Department of Commerce's ability to protect certain kinds of manufacturers. So why wouldn't that be true of virtually every import case? Because it's all a carefully constructed thing through the WTO and the trade representative and the Department of Commerce. You know, under NAFTA, we don't have any imports. We do for China if we think they're going to dump. And then everybody who decides to evade an import tariff would be in your box because they are interfering with a government plan. I don't know about that, Your Honor. Well, no. I mean, tell me why not. Why do we even need these guidelines? There is a principle distinction between anti-dumping duty cases and other general tariff cases. This is a very special one. If more than one person worked together to fool customs, it seems like that would fall in your greater rather than your lesser guideline every single time. No, Your Honor. What I'm saying is here this is an anti-dumping case. Anti-dumping duties are applied whenever there is an unfairness in the market. That's not true of other customs duties cases. This is a case where the Department of Commerce saw a problem in the international trade of these commodities. They're very closely related. How do we know which tariff case is just anti-dumping and where would we go for the Sentencing Commission to tell us that? I do not know exactly where the Court would draw the line, but it would certainly draw the line so that this kind of case, anti-dumping case, is a very special type of case. Before you run out of time, I better ask you about something else that's been on my mind. These wire coat hangers are kind of famous. Like there's an NPR story about how it's putting dry cleaners out of business and costs them an extra $4,000 a year and all this. It's not in the record. We don't take account of that. Your policy arguments about how horrible it is and it's costing America jobs and the NPR arguments about how it's putting all these poor immigrant dry cleaners out of business, it's all irrelevant. But what is relevant is the calculation of the amount of tariffs that the government was deprived of. And it looks like the judge ignored the invoices and ignored the actual tariff amounts in the Federal Register and instead just signed on to the government expert's calculation. She said there was only a slight difference in tariffs under a later provision that applied to the crime in this case. That was not true. It was about a 99% difference. And it looks as though she just miscalculated. It also looks as though the invoice is showing where the hangers came from because they're different hanger tariffs for different Chinese companies. It looks as though she ignored that and the judge ignored it. Why doesn't he have to make findings about that? And why can't he do his own arithmetic? I mean, this stuff is simple. You look at wire code hangers from the housing company or whatever it is, and you multiply the number of hangers or the number of tons of hangers or whatever the measure is. I have it here, actually, by the tariff. Well, the question is, because we're running out of time, shouldn't this go back so that that can be redone? No. Your Honor, incorrectly characterizes what happened below. There was a lot of discussion about which rate should apply, both in plea negotiations and in all the documents filed with the court. What Judge Houston did was he took on the one hand an expert's declaration about what the applicable duty rate is, which includes far more than math. This is a very complicated auditing job. That includes classification of the hangers and customs regulations. And this expert concluded that the 187.25% applied. What is particularly important about this expert is that she's very persuasive. She filed a second declaration where she observes and evaluates all of the facts that were put forward by Huizar and his lawyers. And she said that even if you accept everything that he says as true, and there are plenty of reasons not to believe that everything he says is true, she would still conclude that 187.25% is the applicable duty rate. And I would submit to the Court that it's certainly not clear error. What it looks like here is there's a Department of Commerce change at page 27,994, the Federal Register for May 13, 2011, and it cuts the tariff for Shanghai Wells Hanger Company to .15% for Zhaoxing Dingy Metal Clothes Horse Company Limited to 1.71%. We have calculators. It's easy. This is the perfect example of why the District Court did not clearly err in relying on an expert. There are basically two kinds of tariffs. There is the all-China rate, and there are specific manufacturer rates for those manufacturers who have come forward to the Department of Commerce and asked and been granted a lower rate. The District Court already answered the anterior question here, which is does the all-China rate apply, or are there specific manufacturers here? And the District Court found that the all-China rate applies relying on an expert who, seeing everything that Mr. Huizar submitted before, concluded that even if everything he said was true, the all-China duty rate would still apply. Why does the all-China duty rate apply? Ms. Vance sets forth a number of reasons, particularly in her second declaration. She sets forth that Mr. Huizar's hangers are commingled when they come back into the United States. She sets forth that in a fraud case such as this,  So what she's saying is really a legal argument. She's saying he doesn't get the Schausing Dinghy Metal Clothes Horse Company tariff of 1.71 percent because those hangers are in the container mixed with hangers that don't come from the Schausing Dinghy Metal Clothes Horse Company. Is there a reg that says where the coat hangers are commingled, you don't apply the tariff that the invoice shows is appropriate? What I'm thinking is every time you come back from a foreign country, the stuff you bought from one vendor in the market is commingled in your suitcase with stuff you bought from other vendors in the market, but that doesn't change what the tariff is. It seems like it's just a legal argument, and unless you can show there's some legal justification for it, it's a weak one. I have a two-step response to that. First, it's a matter of fact. What is the duty rate that's applicable, and what has the victim lost? The victim came forward, supported its position with an expert, and the district court didn't clearly err in accepting the conclusions of the expert. If the court would like a legal argument... It's not a neutral expert. It's just the tax collector says, in my judgment, he owes a lot of money. The individual says, in my judgment, I owe a little money, and the judge makes an independent judgment. The judge did make an independent judgment to accept the conclusions of the expert. The second step to my response is to say that there are legal arguments. Because we believe that this is a question of fact, we do not submit them to the court. But for example... Let's be more specific. Is there a law or a regulation or a provision in a Federal Register announcement or some authoritative provision that says if the coat hangers from one company are commingled in a shipment with coat hangers from another company, you apply the all-China rate rather than the rate for the particular purchase? The short answer is no. The longer answer is that there are regs, which I can find I don't have off the top of my head, that say unless an importer shows that the specific manufacturer is at issue, the all-China rate applies. Well, then, they did show that there were specific manufacturers at issue. Anyway, your time is up, and we'll hear from... The second... We'll hear from Alaska's counsel now. Thank you. Thank you, Your Honor. Thank you. You have a minute. All right. I'll try to talk fast. I think the government was misled, so to me it was plain error. Excuse me. The district court was misled by the expert and to some extent the government in not knowing what the true rates were. The government in their papers, and I discussed this in mine, said that the rates that the defense lawyer put forth, which were actually wrong, he was asking for 187 versus 55. He didn't know that they had gone down all the way. They had already gone down before sentencing, but the government says that that was the correct rate. Do the experts give any reason other than that's our policy for not using the specific rates for the specific... Not other than what's already been discussed. The district court, the government in their sentencing papers, said that CBP, Customs and Border Protection, set the rates. It was not a litigating position to discuss in the district court, but that's false. That's blatantly false. The Department of Commerce set the rates. CBP enforced the laws like a cop on the street and the Senate or Congress setting what the law should be for the law enforcement to follow. If you note, in our brief, I don't have the page off the top of my head, but the special addendum, the federal registers that we include, page 15 of them, there's actually a discussion of the Huizar case without mentioning his name, but it mentions that there was somebody indicted. As far as I know, he's the only person in the United States that was indicted for this offense, where CBP was called for not being able to document. They were not able to document that a higher rate should apply. That's anecdotal, but it shows that CBP doesn't decide for the district court, but I think the district court was put in a position by how the case came to it to make that decision the way it did, and I think it was wrong. Thank you, Mr. Torriano. The case just argued of United States v. Huizar Velazquez is submitted. Thank both counsel for your argument this morning. Thank you for coming from San Diego.
judges: Quist, Kleinfeld, McKeown